**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |  |
|---|---|---|
| TAMARA CRISCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:22CV38 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Tamara Crisco, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 13; see also Docket Entry 11 (Plaintiff's Brief); Docket Entry 14 (Defendant's Memorandum); Docket Entry 15 (Plaintiff's Reply). For the reasons that follow, the Court should enter judgment for Defendant.

# I. PROCEDURAL HISTORY

Plaintiff applied for SSI on October 15, 2019 (Tr. 227-38)[1] and, upon denial of that application initially (Tr. 93-107, 126-29) and on reconsideration (Tr. 108-25, 136-40), she requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 141-43). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 27-49.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 9-26.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 220-22, 334-35), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] has not engaged in substantial gainful activity since October 15, 2019, the application date.
>
> . . .
>
> 2. [Plaintiff] has the following severe impairments: depression, anxiety, post-traumatic stress syndrome,

---

[1] Plaintiff also applied for Disability Insurance Benefits ("DIB") (see Tr. 223-26), but the record contains no further mention of that application likely due to the expiration of Plaintiff's disability insured status (see Tr. 53 (reflecting expiration on December 31, 2016), 71 (indicated insured status expired on December 31, 2017)). Further, notwithstanding Plaintiff's alleged onset date for her SSI claim of November 1, 2018, Plaintiff lacked eligibility for SSI benefits until her application date of October 15, 2019 (see Tr. 223). See 20 C.F.R. § 416.202 (explaining that a claimant remains ineligible for SSI benefits until date he or she files SSI application); 20 C.F.R. § 416.501 (stating that a claimant may not receive SSI benefits for any period that predates first month he or she satisfies eligibility requirements, which cannot precede application date).

fibromyalgia, osteoarthritis, degenerative disc disease, and degenerative joint disease.

. . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except [she] can only occasionally perform postural activities and should avoid workplace hazards. [Plaintiff] can perform unskilled work and carry out routine, repetitive tasks, but cannot perform work requiring a production rate or demand pace. [Plaintiff] is able to sustain attention and concentration for two hours at a time. [Plaintiff] should avoid work environments dealing with crisis situations, complex decision making, or constant changes in a routine setting. [Plaintiff] can frequently but not continuously contact or have interactions with supervisors, and only occasional contact or interactions with coworkers and the public. [Plaintiff] can engage in frequent use of the dominant right upper extremity for pushing, pulling, and operating hand controls, as well as reaching in all directions including overhead. [Plaintiff] must be allowed to alternate between sitting and standing up to twice each hour.

. . .

5. [Plaintiff] is unable to perform any past relevant work.

. . .

9. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

3

> 10. [Plaintiff] has not been under a disability, as defined in the . . . Act, since October 15, 2019, the date the application was filed.

(Tr. 14-22 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro</u>

4

v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]."  Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)."  Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

5

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]   "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition."   Id.   "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled."   Id.

This sequential evaluation process ("SEP") has up to five steps:   "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work."   Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3]   A finding adverse to the

---

[2]  The Act "comprises two disability benefits programs.  The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed.  [SSI] provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical."   Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the
(continued...)

claimant at any of several points in the SEP forecloses an award
and ends the inquiry. For example, "[t]he first step determines
whether the claimant is engaged in 'substantial gainful activity.'
If the claimant is working, benefits are denied. The second step
determines if the claimant is 'severely' disabled. If not,
benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th
Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, "the claimant is disabled." Mastro,
270 F.3d at 177. Alternatively, if a claimant clears steps one and
two, but falters at step three, i.e., "[i]f a claimant's impairment
is not sufficiently severe to equal or exceed a listed impairment,
the ALJ must assess the claimant's residual functional capacity
('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess
whether, based on that RFC, the claimant can perform past relevant
work; if so, the claimant does not qualify as disabled. See id. at
179-80. However, if the claimant establishes an inability to

_____

[3] (...continued)
[Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's]
limitations." Hines, 453 F.3d at 562 (noting that administrative regulations
require RFC to reflect claimant's "ability to do sustained work-related physical
and mental activities in a work setting on a regular and continuing basis . . .
[which] means 8 hours a day, for 5 days a week, or an equivalent work schedule"
(internal emphasis and quotation marks omitted)). The RFC includes both a
"physical exertional or strength limitation" that assesses the claimant's
"ability to do sedentary, light, medium, heavy, or very heavy work," as well as
"nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658
F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers
all relevant evidence of a claimant's impairments and any related symptoms (e.g.,
pain)." Hines, 453 F.3d at 562-63.

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[5]

## **B. Assignments of Error**

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ's RFC finding is incomplete and not supported by substantial evidence, warranting remand" (Docket Entry 11 at 9 (bold font and single-spacing omitted); <u>see also</u> Docket Entry 15 at 1-4); and

2) "[former] Acting Commissioner [Nancy] Berryhill lacked statutory authority under the [Federal Vacancies Reform Act ('FVRA')] to ratify the appointment of SSA ALJs in 2018" (Docket

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Entry 11 at 21 (bold font and single-spacing omitted); see also Docket Entry 15 at 4-13).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 14 at 4-31.)

## 1. RFC

Plaintiff's first issue on review argues that "[t]he ALJ's RFC finding is incomplete and not supported by substantial evidence, warranting remand."  (Docket Entry 11 at 9 (bold font and single-spacing omitted); see also Docket Entry 15 at 1-4.)  In particular, Plaintiff contends that "the ALJ failed to properly evaluate the supportability and consistency of the treating opinions from [Plaintiff]'s psychiatrist, Dr. [Richard A.] Fellman and [Plaintiff's primary care physician,] Dr. Victor Ha[ ]."  (Docket Entry 11 at 9-10.)  Plaintiff deems "[t]he ALJ's errors in evaluating the treating opinions and determining [Plaintiff]'s RFC [] harmful because the [VE] testified that the following limitations would preclude a hypothetical individual from sustaining competitive employment: exceeding employer tolerance for off-task time, requiring redirection on a daily basis, and responding inappropriately to supervision, coworkers, or the public[ and, h]ad the ALJ credited th[o]se limitations, [Plaintiff] would be disabled."  (Id. at 20 (citing Tr. 44-45, 47).)  Those contentions lack merit.

9

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 227-38)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions and prior administrative medical findings or accord special deference to treating source opinions. See 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[6] Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she

---

[6] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5).

10

considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R. § 416.920c(b)(2).[7] The ALJ must only address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. § 416.920c(c)(3)-(5) — when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 416.920c(b)(3).

a. <u>Dr. Fellman</u>

On March 20, 2020, Dr. Fellman completed a preprinted form entitled "Medical Assessment of Ability to Sustain Work-Related Activities (Mental)" (Tr. 494-95), on which he opined that Plaintiff could satisfactorily perform the following mental, work-related tasks for less than 75 percent of an eight-hour workday:

---

[7] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; <u>see also</u> 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; <u>see also</u> 20 C.F.R. § 416.920c(c)(2).

11

- follow work rules

- relate with coworkers, supervisors, and the public

- handle routine changes and ordinary stresses

- remain on-task without extra supervision

- sustain acceptable pace without extra supervision

- learn, understand, and use new information or instructions

- meet attendance standards

- understand, remember, and carry-out simple instructions

- understand, remember, and carry-our more than one-to two-step instructions

- remain emotionally stable, socially predictable, and reliable

(Id.) Dr. Fellman explained those limitations by stating that Plaintiff "ha[d] chronic Post Traumatic Stress Disorder [('PTSD'),] . . . anxiety that c[ould] be severe[,] and flashbacks when having to deal with people and stress" (Tr. 494), that "[s]he [wa]s not able to sustain adequate focus due to preoccupation w[ith] anxiety and PTSD symptoms" (id.), and that "[s]he ha[d] anxiety and irritability w[ith] variable capacity to manage that well" (Tr. 495). In Dr. Fellman's view, Plaintiff would "be more limited in a work setting than shown in treatment records," because "she present[ed] fairly well [one-]to[-one] w[ith] a trusted doctor." (Id.)

12

The ALJ found Dr. Fellman's opinions "persuasive" to the extent they "document[ed Plaintiff's] impairments and symptoms," but "only somewhat persuasive" to the extent they reflected "severe and disabling" impairments. (Tr. 19.) The ALJ explained that "[a] careful review of the treatment records documenting the clinical impressions and observations of her providers noted that their mental assessment findings were mostly within normal limits, as [previously] noted in th[e ALJ's] decision." (Id.) Plaintiff challenges that analysis by the ALJ on five grounds, none of which carries the day.

First, Plaintiff faults the ALJ for failing to "identify or explain the purported inconsistencies between Dr. Fellman's opinion and the objective medical evidence," and "which of the limitations found by Dr. Fellman were not supported by the objective evidence." (Docket Entry 11 at 13.) Plaintiff's argument glosses over the fact that, in discounting Dr. Fellman's opinions, the ALJ expressly referred back to her earlier discussion of the objective medical evidence, which had noted that "the mental assessment findings" of Plaintiff's providers remained "mostly within normal limits." (Tr. 19.) In that earlier discussion, the ALJ stated as follows:

> During the period under consideration [Plaintiff] reported financial considerations that reduced her ability to see psychiatry more than every six months [(Tr. 341)]. Despite that reduction, [Plaintiff] required no emergency room psychiatric treatment, and her medications required no significant changes [(Tr. 413-82)]. She presented to her appointments with mental faculties within normal limits, except when she responded

13

> regarding stressors concerning her denials for
> disability, Medicaid, and other services [(Tr. 415, 484-
> 85)].

(Tr. 18.) Indeed, although only <u>one</u> office visit with Dr. Fellman occurred during the relevant period in this case (<u>see</u> Tr. 484-85 (Feb. 25, 2020)), the ALJ considered Dr. Fellman's treatment records (and those of his colleagues who treated Plaintiff) pre-dating the relevant period by up to one year and eight months (<u>see</u> Tr. 18 (citing Tr. 413-82 (covering time period from Jan. 26, 2018, to Sept. 9, 2019))). As the ALJ observed, Dr. Fellman's mental status examinations of Plaintiff consistently showed normal findings, including that she appeared "well kept" with "good eye contact," remained "cooperative," and displayed normal, "articulate" speech, normal thought processes, normal attention and concentration, intact memory, normal fund of knowledge, normal abstracting ability, normal intelligence, and intact insight and judgment except for a pattern of avoidance at times. (Tr. 415, 420-21, 423-24, 428, 431, 436-37, 441-42, 445-46, 449-50, 456-57, 464-65.) Consistent with the ALJ's crediting of Dr. Fellman's "document[ation of Plaintiff's] impairments and symptoms" (Tr. 19), the ALJ found Plaintiff's depression, anxiety, and PTSD severe impairments at step two of the SEP (<u>see</u> Tr. 15) and, consistent with the ALJ's finding Dr. Fellman's opinions as to the impact of Plaintiff's mental impairments on her ability to perform mental work-related abilities "somewhat persuasive" (Tr. 19), the ALJ's

14

mental RFC contained limitations that accounted for Plaintiff's diminished (but not disabling) abilities to interact with others, handle changes and stress, maintain concentration, persistence and pace ("CPP"), and follow instructions (see Tr. 17).

Second, Plaintiff maintains that "the ALJ did not address any of the key insight provided by Dr. Fellman" (Docket Entry 11 at 13), such as the "conclu[sions] that [Plaintiff]'s chronic PTSD and anxiety could be severe" (id. (citing Tr. 494)), that "she had flashbacks when having to deal with people and stress" (id. at 13-14 (citing Tr. 494)), that "her inability to sustain adequate focus was due to her preoccupation with anxiety and PTSD symptoms" (id. at 14 (citing Tr. 494)), that "[s]he had anxiety and irritability with a variable capacity to manage" (id. (citing Tr. 495)), and that "she would be more limited in a work setting than shown in treatment records because she presented fairly well *in a one-on-one basis with a trusted doctor*" (id. (citing Tr. 495) (emphasis supplied by Plaintiff).) Although the ALJ did not specifically address those explanations offered by Dr. Fellman in support of his opinions (see Tr. 19), no basis for remand exists on that ground, because Plaintiff has not shown that remand for the ALJ to expressly discuss those explanations would have resulted in a more favorable outcome in her claim. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in

quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Regarding Dr. Fellman's "conclu[sion] that [Plaintiff]'s chronic PTSD and anxiety could be severe" (Docket Entry 11 at 13 (citing Tr. 494)), and that "[s]he had anxiety and irritability with a variable capacity to manage" (id. at 14 (citing Tr. 495)), the ALJ found Plaintiff's depression, anxiety, and PTSD severe impairments at step two (see Tr. 15) and included significant restrictions in the RFC to unskilled, routine, and repetitive tasks, non-production work, no crisis situations, complex decision-making, or constant changes, and limited interaction with others (see Tr. 17). Concerning Dr. Fellman's explanation that "[Plaintiff's] inability to sustain adequate focus was due to her preoccupation with anxiety and PTSD symptoms" (id. at 14 (citing Tr. 494)), the ALJ acknowledged both that Plaintiff "report[ed] she ha[d] difficulties staying on task" as well as that Dr. Fellman "supported" Plaintiff's report, in finding that Plaintiff's mental impairments caused moderate limitation in CPP (Tr. 16 (citing Tr. 494)).[8]  Respecting Dr. Fellman's comment that "[Plaintiff] would be more limited in a work setting than shown in treatment records

---

[8] Further, the ALJ addressed that moderate CPP deficit by including in the RFC limitations to unskilled, routine, and repetitive tasks not requiring a production rate or demand pace, crisis situations, complex decision-making, or constant changes, as well as significant restrictions on interaction with others (see Tr. 17).  See Grant v. Colvin, No. 1:15CV515, 2016 WL 4007606, at *1, (M.D.N.C. July 26, 2016) (unpublished) (finding RFC's restriction to "non-production oriented" work "facially addresse[d] moderate . . . limitation in the claimant's ability to stay on task"), recommendation adopted, slip op. (M.D.N.C. Sept. 21, 2016) (Osteen, C.J.).

because she presented fairly well in a one-on-one basis with a trusted doctor" (Docket Entry 11 at 14 (emphasis omitted) (citing Tr. 495)), the ALJ here, by adopting a significantly restricted mental RFC (see Tr. 17), found Plaintiff "more limited" than she presented in her visits with Dr. Fellman.

Third, Plaintiff challenges the ALJ's failure to "acknowledge or address the consistency between Dr. Fellman's March 2020 opinion and Dr. Ha's October 2020 letter." (Docket Entry 11 at 14 (citing Tr. 19-20, and referencing Tr. 494-95, 576).) The regulations define the "consistency" of a medical opinion as "the extent to which the opinion is consistent with the evidence from other medical sources," Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 416.920c(c)(2), and the ALJ here expressly found that Dr. Fellman's opinion lacked consistency with "mental assessment findings [that] were mostly within normal limits" (Tr. 19). Although the ALJ did not explicitly compare Dr. Fellman's opinions with those from Dr. Ha (see id.), Plaintiff made no attempt to argue how remand for the ALJ to make that comparison would result in a more favorable result in his claim (see Docket Entry 11 at 14). The two opinions appear to overlap insofar as they both opine that Plaintiff suffered from severe depression, anxiety, and PTSD, as well as that those conditions impaired Plaintiff's ability to concentrate and handle stress. (Compare Tr. 494-95, with Tr. 576.) As discussed above, the ALJ found

17

Plaintiff's depression, anxiety, and PTSD severe impairments at step two (see Tr. 15) and included limitations in the mental RFC to account for Plaintiff's diminished ability to concentrate and handle stress (see Tr. 17).

Fourth, Plaintiff contends that the ALJ failed to explain her finding that Plaintiff remained able to frequently interact with supervisors and occasionally interact with coworkers and the public (Docket Entry 11 at 14 (citing Tr. 17)), "when even the [state agency psychological consultants] found [Plaintiff] could tolerate coworkers and supervisors in a setting in which interactions were *brief, superficial, and task-oriented with only incidental contact with the general public*," and further characterized that limitation as requiring a "setting with *minimal interpersonal demands*" (id. (citing Tr. 103-05, 116-17, 120-22) (emphasis supplied by Plaintiff)). Those contentions ultimately should not prevail.

To begin, Plaintiff's argument fails to recognize that only the state agency psychological consultant at the initial level of review opined that Plaintiff's mental impairments necessitated "brief, superficial and task-oriented" interactions with coworkers and supervisors and "incidental contact" with the general public (Tr. 105; see also id. (limiting Plaintiff to "setting with minimal interpersonal demands")). At the reconsideration stage, the consultant opined that Plaintiff could "interact as necessary for the performance of [simple, routine, and repetitive tasks

18

('SRRTs')]." (Tr. 121; <u>see also</u> Tr. 122 ("The preponderance of evidence indicated that [Plaintiff] would reasonably be capable of SRRTs.").) Thus, only the initial-level consultant's opinions contain social interaction limitations greater than those reflected in the ALJ's mental RFC. (<u>Compare</u> Tr. 17, <u>with</u> Tr. 105.)

The ALJ, however, did not adequately explain why she opted against adopting the initial-level consultant's opinions limiting Plaintiff to "brief, superficial and task-oriented" interactions with coworkers and supervisors and "incidental contact" with the general public (Tr. 105). (<u>See</u> Tr. 19.) In explaining the persuasiveness of the state agency consultants' opinions, the ALJ neither differentiated between the state agency <u>medical</u> consultants and the state agency <u>psychological</u> consultants nor between the <u>initial</u>-level and <u>reconsideration</u>-level consultants:

> [The ALJ] considered the medical opinions of the [s]tate [a]gency consultants in [the] record, but found them only somewhat persuasive due to their inconsistency with a longitudinal review of the full record. The state agency examiners did not have the benefit of all of [Plaintiff]'s medical records and <u>do not fully account for her non-exertional limitations and subjective complaints</u> which are consistent with and supported by the clinical impressions and observations of her providers. <u>Their medical opinions regarding [Plaintiff]'s [RFC] are in excess of what a longitudinal review of the full record indicates [Plaintiff] is capable of performing on a sustained basis</u> in light of their [sic] medically determinable impairment symptoms, and are only partially persuasive.

(Tr. 20 (emphasis added).) As the language emphasized above makes clear, the ALJ believed that Plaintiff's impairments caused <u>greater</u>

limitations than the state agency consultants found. That finding, however, makes sense only when applied to the state agency <u>medical</u> consultants and the <u>reconsideration</u>-level <u>psychological</u> consultant, who each proffered <u>lesser</u> limitations than found by the ALJ (<u>compare</u> Tr. 17, <u>with</u> Tr. 101-02, 118-19, 120-22), but does <u>not</u> explain why the ALJ omitted the initial-level consultant's restrictions to "brief, superficial and task-oriented" interactions with coworkers and supervisors and "incidental contact" with the general public (Tr. 105).

Despite the ALJ's error involving the initial-level psychological consultant's opinion, Plaintiff has not shown prejudicial error under the circumstances presented here. <u>See generally</u> <u>Fisher</u>, 869 F.2d at 1057 (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). The <u>DOT</u> codes for the two jobs the ALJ found Plaintiff able to perform – Garment Sorter, <u>DOT</u> No. 222.6**8**7-014 ("Garment Sorter"), 1991 WL 672131 (G.P.O. 4th ed. rev. 1991), and Marker, <u>DOT</u> No. 209.5**8**7-034 ("Marker"), 1991 WL 671802 (<u>see</u> Tr. 21), contain a fifth digit, or 'People' rating, of "8," "reflecting the lowest possible level of human interaction that exists in the labor force," <u>Fletcher v. Colvin</u>, No. 1:15CV166, 2016 WL 915196, at *10 (M.D.N.C. Mar. 4, 2016) (unpublished), <u>recommendation adopted</u>, slip op. (M.D.N.C.

Mar. 28, 2016) (Osteen, C.J.).  Moreover, both jobs rate the activity of "Taking Instructions – Helping" as "Not Significant" and reflect the tasks of "Talking" and "Hearing" as "Not Present - Activity or condition does not exist."  DOT, No. 222.687-014 ("Garment Sorter"), 1991 WL 672131; DOT No. 209.587-034 ("Marker"), 1991 WL 671802.[9]

Consequently, Plaintiff has not shown that remand for the ALJ to include greater interaction limitations in the RFC would result in a different outcome in her case.  See Ridley G. v. Commissioner of Soc. Sec., No. 1:20CV773, 2021 WL 4307507, at *8, *13 (N.D.N.Y. Sept. 22, 2021) (unpublished) (deciding that RFC restriction to no interaction or tandem tasks with coworkers harmonizes with jobs with DOT level 8 interaction); Scott C. v. Commissioner of Soc. Sec., No. 2:20CV109, 2021 WL 2682276, at *4-5 (D. Vt. June 30, 2021) (unpublished) ("'[L]evel 8 interaction [in the DOT] is compatible with an RFC limiting a claimant to only superficial contact with coworkers, supervisors, and the public.'" (quoting Alie v. Berryhill, 4:16CV1352, 2017 WL 2572287, at *16 (E.D. Mo. June 14, 2017) (unpublished)) (emphasis added)); Wilson v. Saul, No. 1:19CV1089, 2020 WL 6293132, at *4 (M.D.N.C. Oct. 27, 2020) (unpublished) (Webster, M.J.) ("[E]ven assuming the ALJ erred here

---

[9] The VE testified (and the ALJ found) that 121,000 of such jobs existed in the national economy (see Tr. 21, 42-44, 46-47), which clearly represents a significant number of jobs under Fourth Circuit precedent, see Hicks v. Califano, 600 F.2d 1048, 1051 (4th Cir. 1979) ("We do not think that the approximately 110 jobs testified to by the [VE] constitute an insignificant number.").

by failing to include additional social limitations in the RFC . . ., any error would be harmless because the jobs the ALJ concluded that [the p]laintiff could perform do not require significant social interactions. In fact, the [DOT's] descriptions of the jobs identified by the VE list interaction with "People" as being "Not Significant."), recommendation adopted, slip op. (M.D.N.C. Nov. 24, 2020) (Biggs, J.); Eldridge v. Berryhill, No. CV 16-5289, 2018 WL 1092025, at *2 (W.D. Ark. Feb. 28, 2018) (unpublished) (finding jobs categorized by DOT as involving level 8 interaction consistent with restrictions to "limited contact with the general public" and "incidental contact with co-workers" (emphasis added)); Shorey v. Astrue, No. 1:11CV414, 2012 WL 3475790, at *6 (D. Me. July 13, 2012) (unpublished) (holding that "inclusion of a limitation to occasional, brief, and superficial contact with coworkers and supervisors in the [ALJ]'s hypothetical question would not have excluded" jobs with a DOT "People" rating of 8), recommendation adopted, 2012 WL 3477707 (D. Me. Aug. 14, 2012) (unpublished); Flaherty v. Halter, 182 F. Supp. 2d 824, 851 (D. Minn. 2001) (finding jobs with "not significant" levels of social interaction under the DOT compatible with ALJ's limitation to "brief superficial type of contact with co-workers and supervisors and members of the public" (emphasis added)).

Fifth, Plaintiff complains that the ALJ "fail[ed] to appreciate [Dr. Fellman's] longitudinal treatment relationship with

[Plaintiff] since 2018 and the unique perspective provided by that relationship of her ongoing mental symptoms, response to treatment, and the interplay between her mental and physical impairments." (Docket Entry 11 at 15 (citing Tr. 413-82).) That argument ignores the fact that the ALJ need only address the nature and extent of the medical source's relationship with the claimant and area of specialization when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 416.920c(b)(3). The ALJ in this case made no such finding (see Tr. 19-20) and did not err by omitting an express discussion of Dr. Fellman's longitudinal treatment relationship with Plaintiff.

In sum, Plaintiff has not shown prejudicial error with respect to the ALJ's evaluation of Dr. Fellman's opinions.

b. Dr. Ha

Dr. Ha submitted a letter addressed "To Whom It May Concern" on October 13, 2020, which stated that Plaintiff "remain[ed] unable to be employed due to symptoms of depression, anxiety, and PTSD which are severe enough to interfere with her ability to concentrate and handle stressful situations." (Tr. 576.) The ALJ remarked that, "[t]o the extent" Dr. Ha "document[ed Plaintiff's] impairments and symptoms," the ALJ found Dr. Ha's opinions "persuasive." (Tr. 19.) In contrast, the ALJ deemed Dr. Ha's "statement of disability . . . less persuasive as disability is an

23

issue reserved to the Commissioner pursuant to 20 CFR . . . 416.927(d)." (Id.) Plaintiff attacks that analysis on two grounds, neither of which warrants remand.

First, Plaintiff faults the ALJ for "not address[ing] the regulatory factors of supportability and consistency" or "Dr. Ha's explanation that [Plaintiff]'s symptoms were severe enough to interfere with her ability to concentrate and handle stressful situations." (Docket Entry 11 at 18 (citing Tr. 19-20, 576).) Although the ALJ did not expressly quote Dr. Ha's full opinion (see Tr. 19), the ALJ did consider the opinion's supportability and consistency by noting that "[t]he longitudinal treatment records d[id] not indicate that [Plaintiff]'s impairments [we]re severe and disabling as alleged" (id. (emphasis added)), and that "[a] careful review of the treatment records documenting the clinical impressions and observations of her providers noted that their mental assessment findings were mostly within normal limits" (id.). Furthermore, the ALJ accounted for Plaintiff's decreased ability to concentrate and handle stress by including limitations in the RFC to unskilled, routine and repetitive tasks, non-production work, no crisis situations, complex decision-making, or constant changes, and limited interaction with others (see Tr. 17).[10]

---

[10] Plaintiff again argues that the ALJ failed to consider Dr. Ha's opinion's "consisten[cy] with Dr. Fellman's earlier opinion regarding [Plaintiff]'s limitations in handling ordinary work stresses and remaining on-task." (Docket Entry 11 at 18 (citing Tr. 19-20, 494-95).) As explained above, although the ALJ did not expressly compare Dr. Ha's opinion to Dr. Fellman's opinions (see Tr. 19-
(continued...)

24

Second, Plaintiff maintains that "the ALJ failed to appreciate the reality of [Plaintiff]'s chronic mental impairments, their effects on her physical impairments, and vice versa, as noted in Dr. Ha's treatment notes." (Docket Entry 11 at 18.) In support of that argument, Plaintiff points to three statements offered by Dr. Ha in 2018 discussing the interplay between Plaintiff's physical and mental impairments. (Id. at 18-19 (citing Tr. 376-79, 389-91, 397-400).) Plaintiff's argument fails because, as a general matter, the ALJ labored under no obligation to discuss records significantly predating the relevant period in this case, and the regulations did not require her to consider such matters in evaluating the persuasiveness of Dr. Ha's opinion, see 20 C.F.R. § 416.920c(b)(3) (providing that ALJ need only address the nature and extent of the medical source's relationship with the claimant, area of specialization, and "other factors that tend to support or contradict a medical opinion" when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency).

---

[10] (...continued)
20), the ALJ found Dr. Ha's opinion inconsistent with the "mental assessment findings [that] were mostly within normal limits" (Tr. 19). Moreover, Plaintiff failed to explain how remand for the ALJ to compare the two opinions to each other would result in a materially different outcome in her claim. (See Docket Entry 11 at 18.) The two opinions both posit that Plaintiff suffered from severe depression, anxiety, and PTSD, as well as that those impairments diminished Plaintiff's abilities to concentrate and handle stress (compare Tr. 494-95, with Tr. 576); however, the ALJ included limitations in the RFC to account for Plaintiff's challenges with maintaining concentration and handling stress (see Tr. 17).

In light of the foregoing analysis, Plaintiff's first assignment of error falls short.

## 2. Appointments Clause

Plaintiff's second and final issue on review maintains that former "Acting Commissioner Berryhill lacked statutory authority under the FVRA to ratify the appointment of SSA ALJs in 2018." (Docket Entry 11 at 21 (bold font and single-spacing omitted); see also Docket Entry 15 at 4-13.) In particular, Plaintiff contends that "[Berryhill's] appointment ended on November 17, 2017" (Docket Entry 11 at 22 (citing U.S. Gov't Accountability Office ("GAO"), No. B-329853, "Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998 – Commissioner, Social Security Administration," www.gao.gov/assets/700/690502.pdf, at 2 (Mar. 6, 2018) ("GAO Notice"))), and thus that "Berryhill was not presently serving as Acting Commissioner when President Trump nominated Andrew Saul to be SSA Commissioner on April 12, 2018" (id. at 23-24). According to Plaintiff, "[Section] 3346(a) [of the FVRA] d[id] not permit Berryhill to resume acting as Commissioner" upon Saul's nomination (id. at 24), because Section 3346 constitutes a tolling provision (id. at 25 (citing NLRB v. SW Gen., Inc., 580 U.S. 288, 296 (2017)); see also id. at 26 (citing L.M.-M. v. Cuccinelli, 442 F. Supp. 3d 1, 34 (D.D.C. 2020))), rather than a "'spring back' provision (id. (citing Brian T.D. v. Kijakazi, 580 F. Supp. 3d 615, 629 (D. Minn. 2022), appeal filed sub nom Dahle v.

<u>Kijakazi</u>, No. 22-1601 (8th Cir. Mar. 22, 2022))), and "'[t]olling cannot be applied retroactively to extend a limitations period that has already expired before the tolling event occurs'" (<u>id.</u> (quoting <u>MacLean v. United States</u>, 454 F.3d 1334, 1337 (Fed. Cir. 2006))). For the following reasons, Plaintiff's arguments fall short.

a.    <u>The FVRA</u>

Resolution of Plaintiff's second issue on review turns on interpretation of the FVRA, which:

> provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required.  5 U.S.C. § 3345 et seq.  The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." <u>Id.</u> § 3345(a)(1).  Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers.  <u>Id.</u> § 3345(a)(2)– (a)(3). . . .  The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency.  <u>Id.</u> § 3347.  And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," <u>id.</u> § 3348(d)(1), and any such action "may not be ratified," <u>id.</u> § 3348(d)(2).

<u>Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.</u>, 496 F. Supp. 3d 31, 53 (D.D.C. 2020), <u>appeal dismissed</u>, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021).

27

The specific provision of the FVRA at issue in this case, governing the time limits on serving in an acting capacity under the FVRA, provides as follows:

(a) . . . the person serving as an acting officer as described under section 3345 may serve in the office–

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve--

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346 (emphasis added).

b.   Factual Background

In December 2016, President Barack Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. See "Memorandum Providing an

28

Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner remained vacant. See GAO Notice, at 1. On March 6, 2018, the GAO Notice reported that, pursuant to Section 3346(a)(1) of the FVRA, Berryhill's service as Acting Commissioner had expired on November 16, 2017. See GAO Notice, at 2.[11] Following the GAO Notice, Berryhill stepped down as Acting Commissioner but continued to lead the SSA as DCO. See Patterson v. Berryhill, No. 2:18CV193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (unpublished). On April 17, 2018, President Trump nominated Andrew Saul to the position of Commissioner of the SSA, an action which the SSA interpreted as permitting Berryhill to resume serving as Acting Commissioner as of that date under Section 3346(a)(2) of the FVRA, the so-called "spring-back" provision. See Reuter v. Saul, No. 19CV2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020) (unpublished) (internal quotation marks omitted), recommendation adopted, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020) (unpublished).

---

[11] The FVRA added 90 days to the 210-day time limit for Berryhill to serve, because the Commissioner of SSA's vacancy began on President Trump's "transitional inauguration day" (January 20, 2017). 5 U.S.C. § 3349a(b)(1). Thus, November 16, 2017 constituted the 300th day after the January 20th inauguration.

On June 21, 2018, the United States Supreme Court issued <u>Lucia</u> <u>v. Securities & Exh. Comm'n</u>, 585 U.S. ___, 138 S. Ct. 2044 (2018), which held, based on its prior case <u>Freytag v. Commissioner of Int.</u> <u>Rev.,</u> 501 U.S. 868 (1991), that the SEC's ALJs qualified as "inferior Officers" subject to the Appointments Clause rather than federal employees, because they "h[e]ld a continuing office established by law" and "exercise[d] . . . significant discretion when carrying out . . . important functions." <u>Lucia</u>, 585 U.S. at ___, 138 S. Ct. at 2053 (internal quotation marks omitted).[12] Because the SEC ALJ who decided the plaintiff's case lacked "the kind of appointment the [Appointments] Clause requires," i.e., appointment by the "President alone," "the Courts of Law," or "the Heads of Departments," U.S. Const. art. II, § 2, cl. 2, the Supreme Court "held that the appropriate remedy for an adjudication tainted with an appointments violation [wa]s a new hearing before a [different,] properly appointed official." <u>Id.</u> at ___, 138 S. Ct. at 2055 (internal quotation marks omitted).

Although "[<u>Lucia</u>] did not specifically address the constitutional status of ALJs who work in . . . the [SSA, t]o

---

[12] The Appointments Clause provides as follows:

> [The President of the United States] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the [DOJ], on July 16, 2018[,] Berryhill ratified the appointments of [the SSA's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, <u>Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council</u>, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-1p"). At the time Berryhill did so, she continued to use the title "Acting Commissioner of Social Security." <u>Id.</u>

c. <u>Brian T.D.</u>

Plaintiff primarily relies on the reasoning in <u>Brian T.D.</u> to support her argument that Berryhill lacked authority under the FVRA to ratify the appointments of the SSA's ALJs on July 16, 2018. (<u>See</u> Docket Entry 11 at 24-27 (citing <u>Brian T.D.</u>, 580 F. Supp. 3d at 631-35).)[13] In that case, the court concluded that, because "Section 3346(a) [of the FVRA] applies to 'the person <u>serving</u> as an acting officer,'" <u>Brian T.D.</u>, 580 F. Supp. 3d at 629 (emphasis added) (quoting 5 U.S.C. § 3346(a)), and because, "[w]hen Saul was first nominated to become Commissioner on April 17, 2018, Berryhill

---

[13] Plaintiff additionally notes that, "[s]ince Magistrate [Judge] Schultz issued [<u>Brian T.D.</u>,] District [] Judge Katherine Menendez fully adopted the *Brian T.D.* analysis (Docket Entry 11 at 25 (citing <u>Richard J.M. v. Kijakazi</u>, No. 19CV827, 2022 WL 959914 (D. Minn. Mar. 30, 2022) (unpublished), <u>appeal filed sub nom Messer v. Kijakazi</u>, No. 22-2127 (8th Cir. May 27, 2022))), and that "Chief District Judge Tunheim 'encourage[d]' another Social Security claimant 'to consider filing a Rule 60 motion' because *Brian T.D.* provides 'substantial grounds for relief'" (<u>id.</u> at 25-26 (citing <u>Elizabeth A.W. v. Kijakazi</u>, No. 20CV1733, 2022 WL 867293, at *2 (D. Minn. Mar. 10, 2022) (unpublished), <u>vacated and remanded to magistrate judge</u>, 2022 WL 3020504 (D. Minn. July 29, 2022) (unpublished))).

was not then <u>serving</u> as Acting Commissioner," <u>id.</u> (emphasis added), "by its plain language, § 3346(a)(2) d[id] not apply to Berryhill," <u>id.</u>; <u>see also</u> <u>id.</u> (stating that "[c]ourts have frequently looked to Congress' choice of verb tense to interpret statutes," and that, "[w]hen a [c]ourt is determining the meaning of an Act of Congress, the present tense generally does not include the past" (citing <u>Carr v. U.S.</u>, 560 U.S. 438, 447 (2010) (in turn, citing the Dictionary Act, 1 U.S.C. § 1))).

The <u>Brian T.D.</u> court thereafter provided further interpretations of the FVRA that purportedly supported its above-described conclusion regarding Section 3346(a)(2)'s inapplicability to Berryhill, including that:

- "[s]ubsection [3346](b)(1) states that if a nomination is rejected, withdrawn, or returned, 'the person may **continue to serve** as the acting officer for no more than 210 days[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(1)), and "[s]ubsection [3346](b)(2) states that if a second nomination is unsuccessful, 'the person **serving** as the acting officer may **continue to serve**[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(2));

- "[section] 3348 [of the FVRA] confirms [<u>Brian T.D.</u>'s] reading[ of Section 3346(a) because, u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete," <u>id.</u> at 630 (quoting 5 U.S.C. § 3348(b)(1) & (2)); <u>see also</u> <u>id.</u> at 631 ("[t]o accept [the Commissioner]'s interpretation of § 3346(a)(2) would require the Court to ignore (or rewrite) § 3348");

- the Commissioner's interpretation of Section 3346(a) as "allow[ing] Berryhill to resume acting

32

as Commissioner (that is, to spring back into that position) when President Trump nominated Saul, even though her initial statutory term had expired . . . misreads the statutory language[, because t]he word 'or' modifies the entire provision that limits the acting officer to a period 'no longer than' 210 days from the date the vacancy arose[ and, t]hus, when read with the entirety of subsection [3346](a)(1)[,] 'or' serves to suspend that time limitation, not to create an entirely separate and distinct period of service," id. (some internal quotation marks omitted) (quoting 5 U.S.C. § 3346(a)(1)).

For the reasons more fully explained below, the Court should decline to follow the reasoning of Brian T.D. and conclude that Berryhill properly served as Acting Commissioner under the spring-back provision of Section 3346(a)(2) at the time she ratified the appointments of the SSA's ALJs in July 2018.

d.  Analysis

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985); however, in construing the text of the FVRA, Brian T.D. misconstrues Congress's use of the present tense verb "serving" in Section 3346(a)(1), Brian T.D., 580 F. Supp. 3d at 629. In that regard, the court noted that "Congress, in enacting § 3346, used the present participle 'serving,' rather than the past or present perfect 'served' or 'has served'" and thus that "Section 3346(a) . . . applies to the person presently serving in that capacity and

33

not to a person who had previously served as Acting Commissioner."
Id. (emphasis added).

That argument, however, glosses over the fact that using "the past or present perfect 'served' or 'has served'" to set out the time limits for acting officials under the FVRA would not make sense. Had Congress drafted Section 3346(a) to provide that "the person [who served or who has served] as an acting officer as described under section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. § 3346(a)(1) (dashes and numbering omitted), the Section, by its terms, would provide service time limits only for individuals who had already served as acting officers, which renders the time limits nonsensical. See United States v. Turkette, 452 U.S. 576, 580 (1981) (holding that, in construing statutory language, "absurd results are to be avoided"); see also Sorrells v. United States, 287 U.S. 435, 447 (1932) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to . . . an absurd consequence."); Harris v. United States, 215 F.2d 69, 75 (4th Cir. 1954) (holding that "interpretation of a statute leading to absurd . . . results is to be avoided").

Construing the phrase "the person serving as an acting officer as described under section 3345," 5 U.S.C. § 3346(a) (emphasis added), as merely descriptive, i.e., as explaining that the time limits apply to acting officers under Section 3345 of the FVRA, as

34

opposed to acting officers under other, office-specific vacancy statutes, constitutes a more straightforward and common sense interpretation of Section 3346(a). See Snyder v. Kijakazi, No. 21CV103, 2022 WL 4464847, at *19 (N.D. Iowa Sept. 26, 2022) (unpublished) ("[T]he language at 5 U.S.C. § 3346 is in the present tense, not because it serves as a limitation, but because it relates to the individual next designated to serve pursuant to the applicable section, Section 3345 of the FVRA."), appeal filed, No. 22-3455 (8th Cir. Nov. 29, 2022); Sidney M. v. Kijakazi, No. 21CV2034, 2022 WL 4482859, at *16 (N.D. Iowa Sept. 26, 2022) (unpublished) ("[R]eference to 'the person serving as acting officer' refers to who may serve generally under § 3345 and [] there is no requirement that the person be currently serving to serve under subsection (a)(2). The phrase 'the person serving as an acting officer' applies equally to subsection (a)(1) and it would be nonsensical for the statute to allow a person to serve on 'the date the vacancy occurs' while also requiring that person to be presently serving as an acting officer. There cannot be a vacancy and a 'person serving as an acting officer' at the same time."); Bauer v. Kijakazi, No. 21CV2008, 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022) (unpublished) (deeming it "[s]ignificant[]" that "the active verb in § 3346(a) is not serving, but 'may serve,'" and thus finding that "'serving' is used to refer back to [S]ection 3345, which sets out who may serve as an

35

acting officer"); <u>Lance M. v. Kijakazi</u>, No. 2:21CV628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022) (unpublished) ("When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of 'present service.' Instead, it constrains section 3346(a)'s scope to individuals whose authority stems from the FVRA."), <u>recommendation adopted</u>, 2022 WL 3007588 (E.D. Va. July 28, 2022) (unpublished).

Moreover, as the Commissioner argues:

> Reading § 3346(a)'s prefatory phrase to limit that subsection's application to only "the person presently serving in [an acting] capacity," <u>Brian T.D.</u>, [580 F. Supp. 3d at 629], would also create an irreconcilable conflict with § 3345. Under the FVRA, the default rule is that the first assistant automatically becomes the acting official, but the President can subsequently displace the first assistant from her acting role by choosing another acting official. *See* 5 U.S.C. § 3345(a)(1)-(3); *see also Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019). But if § 3346(a) applied only to a "presently serving" acting officer, it would incorrectly bar the President from designating an alternative acting official. Were the President to designate an acting official after the first assistant had assumed the role by default, the alternative official would not be the person *presently* "serving as an acting officer as described under section 3345." Under the *Brian T.D.* court's misinterpretation of that phrase, § 3346(a) thus would not permit her to serve *at all* because § 3346(a)'s prefatory phrase applies to service under both § 3346(a)(1) and (a)(2). By the same token, were a first assistant serving as an acting official to die, resign, or otherwise be unable to serve during the vacancy, the President would be incapable of replacing her.

(Docket Entry 14 at 22.) The Court should construe the meaning of the word "serving" in Section 3346(a) in a manner that does not create inconsistencies with other provisions of the FVRA. <u>See NLRB</u>

36

v. Wheeling Electric Co., 444 F.2d 783, 787 (4th Cir. 1971) ("The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect . . . and where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute." (citations omitted)); Milan Puskar Health Right v. Crouch, 549 F. Supp. 3d 482, 490 (S.D.W. Va. 2021) ("[T]he [c]ourt . . . is obligated to avoid statutory interpretations that lead to absurd . . . results if 'alternative interpretations consistent with the legislative purpose are available.'" (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982))).

The Brian T.D. court next found that the "structure and context" of Section 3346 supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill. Brian T.D., 580 F. Supp. 3d at 629. In support of that finding, the court noted that:

> [s]ubsection (b)(1) states that if a nomination is rejected, withdrawn, or returned, "the person may **continue to serve** as the acting officer for no more than 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added). Subsection (b)(2) states that if a second nomination is unsuccessful, "the person **serving** as the acting officer may **continue to serve**." Id. § 3346(b)(2) (emphasis added). Therefore, the plain language of § 3346, indicates that the use of the present participle is deliberate — only a person presently serving may continue to serve. The plain language of § 3346(a)(2) means that it only applies to a person presently serving as Acting Commissioner if at the time of nomination, someone "is performing the functions and duties" in accordance with

37

the FVRA. There is no good reason for construing the word "serving" when used in the first paragraph of § 3346(a) differently than when it is used in § 3346(b).

Id. at 629-30 (emphasis in original).

As discussed above, interpreting the phrase "the person serving as the acting officer" in Section 3346(a) as descriptive rather than as a limitation to individuals presently holding the acting official role comports with common sense. Moreover, "[i]t makes sense that Congress, having written the subsection that allowed a person to serve during the pendency of a nomination in [Section 3346](a)(2), would say that such a person could 'continue' their service after such a nomination failed[ and thus t]hat word choice does not support the idea that a person 'serving' under [Section 3346](a) must be 'currently serving.'" Brent Z. v. Kijakazi, No. 22CV511, 2023 WL 1110449, at *15 (D. Minn. Jan. 30, 2023) (unpublished) (recommendation). Furthermore, the Brian T.D. court's emphasis on the "continue to serve" language in Sections 3346(b)(1) and 3346(b)(2) actually undermines that court's reasoning. In those sections, Congress made clear that an acting official may "continue to serve" in that role for 210 days after the failure of a first or second nomination to the Senate. 5 U.S.C. §§ 3346(b)(1), (b)(2). Had Congress wished to allow an acting official to continue to serve beyond the initial 210 days only if a nomination occurred during that initial 210-day period,

38

Congress could easily have included that same "continue to serve" language in Section 3346(a)(2), but did not do so.

The Brian T.D. court next maintained that "§ 3348 confirm[ed its] reading" of Section 3346(a)(2) because, "[u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete." Brian T.D., 580 F. Supp. 3d at 630 (quoting 5 U.S.C. § 3348(b)). The court disagreed with the Commissioner's "interpret[ation of] § 3346 as providing a person with authority to serve in an acting role (as distinct from merely defining the length of that service)," and pointed out that "§ 3345 [] provides the authority to act as an officer, while § 3346 merely defines the period of that service." Id. at 632. In other words, the court reasoned, "[s]omeone cannot avoid § 3348's directive that the 'office shall remain vacant' by invoking § 3346 as authority to serve as acting officer because § 3348 requires that person to already be performing duties according to §§ 3345, 3346, and 3347." Id.

The Brian T.D. court provided no authority for its interpretation that Section 3346 prescribes only time limits on acting service. See id. In fact, Section 3346(a)(2) does not just address time limits for acting service, i.e., "for the period that the nomination is pending in the Senate," as that Section also prescribes a condition, i.e., a nomination to the Senate, which

39

triggers an additional period of service. Moreover, Section 3348(b)(1) explicitly ties the "remain vacant" provision to the phrase "performing the functions and duties in accordance with sections 3345, 3346, and 3347," 5 U.S.C. § 3348(b)(1) (emphasis added), and, because Berryhill stepped into the role pursuant to President Obama's Succession Memo upon then-Acting Commissioner Colvin's resignation in accordance with Section 3345(a)(3), as well as immediately resumed performing the duties of the office in an acting capacity upon Saul's nomination in accordance with § 3346(a)(2), § 3348(b)(1) did not require the office to "remain vacant." See Sidney M., 2022 WL 4482859, at *17-18 (rejecting Brian T.D.'s interpretation of "remain vacant" provision of Section 3348(b)).

The Brian T.D. court further based its interpretation of Section 3346(a)(2)'s inapplicability to Berryhill on the following analysis of the meaning of the word "or":

> [The Commissioner's] interpretation [of Section 3346(a)] misreads the statutory language. The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service.
>
> A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; *or* . . . once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination. *Id.* § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. *United States v.*

40

*Smith*, 35 F.3d 344, 346 (8th Cir. 1994). In this statute
"or" serves to provide an alternative **length** of service
not to create a series of non-contiguous periods of
service. If the statute were read to create three
distinct periods of service — the initial 210 days, the
first nominee period, and the second nominee period — the
statute would have used the word "and" to separate the
three periods of service.

Construing the word "or" to mean "and," as [the
Commissioner] argues for here, is conjunctive and
"clearly in contravention of its ordinary usage." *Id.*
The plain reading and ordinary usage of the word "or" in
§ 3346(a) is that a person serving as Acting Commissioner
may serve for a 210-day period from the start of the
vacancy, **or** if the person is already "serving as acting
officer" according to the FVRA, may continue serving
during the pendency of a timely nomination. The 210-day
period is a limitation on Berryhill's acting service and
after the 210-day limitation had expired, she could not
later return to acting service, turning § 3346's "or"
into an "and."

Brian T. D., 580 F. Supp. 3d at 631 (emphasis supplied by Brian
T.D.).

The Commissioner persuasively argues that the Brian T.D.
court's above-quoted interpretation of the word "or" in Section
3346(a)(1) constitutes an unreasonable construction of that
commonly-used word:

The use of "or" to mean either one or both of two options
is routine. "The word 'or' has an inclusive sense (A or
B, or both) as well as an exclusive one (A or B, not
both)." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir.
2015). "'The meaning of *or* is <u>usually inclusive</u>.'" *Tex.
Std. Oil Co. v. Forest Oil Corp.*, No. G-05-490, 2008 WL
11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan
A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed.
1995)). For example, if a server comes to a table and
asks whether anyone would like "dessert or coffee," no
one would interpret that to preclude ordering both.

41

(Docket Entry 14 at 17 n.4 (underscoring added).)  Indeed, as well-explained by another district court:

> Authorities agree that . . . or has an inclusive sense as well as an exclusive sense." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 639 (3d ed. 2011).  In its inclusive sense, "or" means "A or B, or both." *Id.*  In its exclusive sense, "or" means "A or B, but not both." *Id.*  Although "or" is used in both senses in common usage, "[t]he meaning of or is <u>usually inclusive</u>." *Id.* (quoting Scott J. Burnham, *The Contract Drafting Guidebook* 163 (1992)) (internal quotation marks omitted).
>
> <u>[The defendant] argues as if the court must choose between construing "or" in its exclusive sense or construing it to mean "and</u>."  But . . . both senses of "or" are commonly used.  In fact, the inclusive use of "or" is the more common.

<u>B-50.com, LLC v. InfoSync Servs., LLC</u>, No. 3:10CV1994, 2014 WL 285096, at *6-7 (N.D. Tex. Jan. 27, 2014) (unpublished) (emphasis added) (certain citations omitted); <u>see also</u> <u>Great Lakes Ins. SE v. Lassiter</u>, No. 21-21452-CIV, 2022 WL 1288741, at *10 (S.D. Fla. Apr. 29, 2022) (unpublished) ("If the [p]olicy sought to use 'or' in an exclusive sense, then it would have prevented such overlap by prefacing the definition with a qualifier like '<u>either</u>.'" (emphasis added)); <u>Mason v. Range Res.-Appalachia LLC</u>, 120 F. Supp. 3d 425, 445 (W.D. Pa. 2015) ("'Stating the matter broadly, we can say that in a permissive sentence the inclusive "or" is interchangeable with the several "and."  Again, <u>this does not say that "and" means "or</u>."  It says that in such a context the two words are reciprocally related: the implied meaning of one is the same as the express meaning of the other.'" (quoting Maurice B. Kirk, <u>Legal Drafting:</u>

The Ambiguity of "And" and "Or," 2 Tex. Tech L. Rev. 235, 243 (1971))); Allstate Ins. Co. v. Plambeck, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014) (noting that, "[a]bsent a qualifying 'either,' 'or' is typically interpreted in the inclusive manner" and explaining that statute in question lacked "limiting words or phrases — such as 'either' or 'but not both' — that might support reading [the statute]'s use of 'or' in the 'exclusive' sense" (emphasis added) (internal quotation marks omitted)).

Here, the word "or" appears in a permissive sentence, i.e., "the person serving as an acting officer as described under section 3345 may serve in the office," 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as "either" and "but not both," see id. Accordingly, the Court should interpret the word "or" in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill to serve both as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), and to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2).[14] Notably, Congress did not include language in Section 3346(a)(2) clarifying that the period of service under that Section applied

---

[14] As the Commissioner notes, "[t]he *Brian T.D.* court's reading of 'or' does not even comport with its *own* interpretation of the term as 'disjunctive, indicating an alternative.' [Brian T.D., 580 F. Supp. 3d at 63.] The court did not hold that an acting officer could serve only pursuant to subsection (1) or subsection (2) [of Section 3346(a)], but not both. Instead, the court *subordinated* the second clause to the first one; its reading permits the person presently serving as an acting officer to serve (i) during the 210-day period, and then also (ii) during the pendency of a nomination, if – but only if – the nomination is submitted within that 210-day period. The word 'or' cannot conceivably support such a reading." (Docket Entry 14 at 25.)

only if the nomination to the Senate occurred during the pendency of the initial, 210-day period of service. See SW Gen., Inc., 580 U.S. at 300-01 (rejecting NLRB's interpretation of Section 3345 of the FVRA, while noting that Congress "could easily have chosen clearer language," as well as finding that "'[t]he fact that Congress did not adopt [] readily available and apparent alternative [language] strongly support[ed]'" the Supreme Court's interpretation of Section 3345 (brackets omitted) (quoting Knight v. Commissioner, 552 U.S. 181, 188 (2008)).[15]

Consistent with that view, the legislative history of the FVRA makes clear that Congress intended "or" in its inclusive sense, and that Section 3346(a)(2) authorizes a second, permissible period of service for Berryhill:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

---

[15] Another section of the FVRA makes clear that Congress knew how to include language indicating that certain time periods for service did not permit breaks in service:

> [T]he President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department without a break in service, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

5 U.S.C. § 3345(c)(1) (emphasis added).

44

S. Rep. 105-250, reporting on Senate Bill 2176, "Federal Vacancies Reform Act of 1998," 1998 WL 404532, at *14 (July 15, 1998) (emphasis added).[16]  Notably, beyond the change from 150 days to 210 days, Section 3346 of Senate Bill 2176 contains the exact same language as Section 3346 of the FVRA.  Compare S.2176, 105th Cong., § 3346, available at www.congress.gov/bill/105th-congress/senate-bill/2176/text, with 5 U.S.C. § 3346.

The Brian T.D. court focused on a different part of the FVRA's legislative history to support its reasoning.  Section 3348(b) of Senate Bill 2176 provided, in pertinent part, as follows:

> (1) if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs--
>
> (A) the office shall remain vacant until the President submits a first nomination to the Senate; and . . .
>
> (2) if the President does not submit a second nomination to the Senate within 150 days after the date of the rejection, withdrawal, or return of the first nomination--
>
> (A) the office shall remain vacant until the President submits a second nomination to the Senate.

S.2176, 105th Cong., § 3348(b), available at www.congress.gov/bill/105th-congress/senate-bill/2176/text (emphasis added) (quotation marks omitted).  The Brian T.D. court found that the absence of the above-emphasized language in FVRA's final text supported the

---

[16]  The version of the FVRA Congress ultimately passed expanded the term an acting official could serve from 150 days to 210 days.  See 5 U.S.C. § 3346(a).

court's interpretation of Section 3346(a)(2) as not applying to Berryhill:

> The FVRA's final text does not include the express "spring-back" language. Publ. L. 105-277, § 151, 112 Stat. 2681 (Oct. 21, 1998). Enacting the FVRA included a "period of intense negotiations" and resulted in "a compromise measure." [*SW Gen., Inc.*, 580 U.S. at 307]. "What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *Id.*

> Here, the Senate Report shows that the Senate considered allowing an officer who had previously acted as Commissioner to return to acting service upon a nomination to the Senate, however Congress chose not to include such language in the final, enacted version of the FVRA. Certainly, the original language of § 3348 demonstrates that if Congress had intended the FVRA to contain a spring back provision they were able to craft such language to clearly and unambiguously express that intent. At best the reliance on the Senate Report illustrates the folly of attempting to discern legislative intent from statements made during the legislative process. *See id.* at [307]; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572[] (2011) ("When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language.").

<u>Brian T.D.</u>, 580 F. Supp. 3d at 633.

<u>Brian T.D.</u>'s reasoning falls short, because the Senate Report did not tie its interpretation of Section 3346(a)(2) as a spring-back provision to the language in <u>Section 3348(b)</u> providing that the office remain vacant "<u>until the President submits a first [or second] nomination to the Senate</u>," 5 U.S.C. § 3348(b) (emphasis added); rather, the Report grounded its interpretation in the language of <u>Section 3346 itself</u>:

46

> Under new section 3346(a)(2), . . . [t]he acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, 1998 WL 404532, at *14 (emphasis added).

Moreover, as recognized by another district court:

> The Congressional Record contains an explanation for th[e] change [in Section 3348(b)] from one of the FVRA's sponsors (in October 1998):
>
>> Changes were made to § 3348(b) to provide that the vacant office provisions of the legislation apply not only when an acting officer has served more than 210 days without a nomination for the office having been submitted to the Senate, but also prior to the 210 days after the vacancy occurs unless an officer of [sic] employee performs the functions of the vacant office in accordance with [the FVRA].
>
> The legislative history from October 1998, after the text of § 3348(b)(1) was changed, continues to support that [ S]ection [3346](a)(2) applied when a nomination was pending, even if the initial 210-day period had already run at the time of nomination.

Bauer, 2022 WL 2918917, at *8-9 (footnote omitted) (citing 144 Cong. Rec. 27,497 (1998)); see also 144 Cong. Rec. 27,498 (1998) (noting that "the language of the [FVRA] is crafted in such a way as to allow for the filling of a vacant office once the President submits a nomination to the Senate" (emphasis added)).

Plaintiff urges the Court to find that Section 3346(a) constitutes a "tolling provision" rather than a "spring back" provision (Docket Entry 11 at 22; see also Docket Entry 15 at 8) based upon the following language in SW Gen., Inc.:

47

> Other sections of the FVRA establish time limits on
> acting service . . . . In most cases, the statute
> permits acting service for "210 days beginning on the
> date the vacancy occurs"; <u>tolls that time limit while a
> nomination is pending</u>; and starts a new 210-clock of the
> nomination is "rejected . . ., withdrawn, or returned."
> [5 U.S.C.] §§ 3346(a)-(b)(1). Upon a successful
> nomination, <u>the time limit tolls once more</u>, and an acting
> officer can serve for an additional 210 days if the
> second nomination proves unsuccessful. [5 U.S.C.]
> § 3346(B)(2).

<u>SW Gen., Inc.</u>, 580 U.S. at 296 (emphasis added). In Plaintiff's
view, "[o]nce the [Supreme] Court has spoken, it is the duty of
other courts to respect that understanding." (Docket Entry 15 at
8 (quoting <u>Rivers v. Roadway Express, Inc.</u>, 511 U.S. 298, 312
(1994)); <u>see also</u> Docket Entry 11 at 26 (arguing that "[t]he DC
Circuit agrees that § 3346 is a tolling provision noting '[w]hen
the 210-day clock on service of an acting official *nears
expiration*, moreover, the President can *extend* the period by
submitting a nomination for the vacant PAS office to the Senate.'"
(quoting <u>L.M.-M.</u>, 442 F. Supp. 3d at 34) (emphasis supplied by
Plaintiff)).) Plaintiff additionally points to the Supreme Court's
citation of Morton Rosenberg's 1998 Report, "The New Vacancies Act:
Congress Acts to Protect the Senate's Confirmation Prerogative" as
persuasive authority in the <u>SW Gen., Inc.</u> decision. (Docket Entry
15 at 7-8 (citing <u>SW Gen., Inc.</u>, 580 U.S. at 295, 307).) According
to Plaintiff, "Rosenberg explained, '[u]nder Section 3346, a person
who is serving in an acting capacity pursuant to Section 3345 may
temporarily hold that office for 210 day [sic] beginning on the

48

date the vacancy occurs . . . [and t]he limitation period is suspended, however, if a first of [sic] second nomination submitted [sic] to the Senate for as long as the nomination is pending in that body.'" (Id. at 8 (citing M. Rosenberg, Congressional Research Service Report for Congress, "The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative," at 10-11 (Nov. 2, 1998), available at https://www.everycrsreport.com/reports/98-892A.html (last visited Feb. 14, 2023)).)

Plaintiff's reliance on SW Gen., Inc. to establish Section 3346(a)(2) as a tolling provision fails, because the Supreme Court's use of the word "tolls" occurred in dicta, SW Gen., Inc., 580 U.S. at 296, as well-explained by the Commissioner:

> Plaintiff homes in on stray language from [*SW Gen., Inc.*], where the Supreme Court stated, as general background, that § 3346(a)'s period is "toll[ed]" during a nomination, *id.* at 936. Section 3346, however was not at issue in [*SW Gen., Inc.*], which concerned the interpretation of § 3345(b)'s restriction on acting service *by the nominee to the permanent office*. The Supreme Court, therefore, did not purport to consider how § 3346(a)(2) would operate when a nomination is submitted after the initial 210-day period of acting service has expired. The Supreme Court's use of the word "toll" in background should not be given talismanic significance because, as the court itself has explained, it is 'undesirable . . . to dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021) (Court "sometimes . . . do[es] not paraphrase complex statutory language as well as we might").

(Docket Entry 14 at 23.) Similarly, the Supreme Court did not rely on Rosenberg's report as "persuasive authority" regarding whether

49

Section 3346(a)(2) serves as a tolling or a spring back provision, but rather cited to it in discussing the history of vacancy statutes in the United States, see SW Gen., Inc., 580 U.S. at 295, and the legislative history of the FVRA generally, see id. at 307.

In the same vein, although the District Court for the District of Columbia noted that "the President can extend the [210-day] period by submitting a nomination for the vacant PAS office to the Senate," that statement also occurred in dicta, L.M.-M., 442 F. Supp. 3d at 34 (emphasis added), and, when the same judge of that court had occasion, just seven months later, to directly address the operation of Section 3346(a)(2), he expressly held that Section 3346(a)(2) permitted an acting official to serve during the period that the nomination remained pending in the Senate even though the nomination had occurred far beyond the initial, 210-day service period:

> Executive Order [13753 ('EO 13753')] designated its order of succession [for the position of Secretary of the Department of Homeland Security ('DHS')] pursuant to the FVRA, which includes a 210-day time limit for acting officials "beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). Here, [Secretary of DHS Kirstjen] Nielsen resigned on April 10, 2019, and far more than 210 days passed before [the Acting Secretary of DHS under EO 13753 Peter] Gaynor purported to amend the order of succession [to list DHS Under Secretary for Strategy, Policy, and Plans Chad Wolf as Acting Secretary of DHS], potentially rendering [Gaynor's] action void. But a separate provision of the FVRA permits an acting official to serve "from the date of" a first nomination for the vacant office and "for the period that the nomination is pending in the Senate." Id. § 3346(a)(2). Because President Trump nominated Wolf [to serve as Secretary of DHS] the same day that Gaynor purported to amend the

50

> order of succession, Gaynor was lawfully serving as
> Acting Secretary under [EO 13753] and the FVRA at the
> time he amended the order of succession.

Northwest Immigrant Rts. Project, 496 F. Supp. 3d at 57–58
(emphasis added).

In contrast to the dicta relied upon by Plaintiff, cases
directly interpreting the application of Section 3346(a)(2) have
overwhelmingly rejected the reasoning of Brian T.D. and, contrary
to Plaintiff's characterization of those cases as "unpersuasive
since they provide little textual analysis" (Docket Entry 11 at 26;
see also Docket Entry 15 at 6), many of the cases provide
comprehensive discussions of the matter, see Brent Z., 2023 WL
1110449, at *13 (providing lengthy and detailed analysis of FVRA's
statutory language and "agree[ing] with the Commissioner, joining
the majority of courts to consider the issue and respectfully
disagreeing with other decisions to the contrary in the District of
Minnesota . . . [that t]he plain text of the [FVRA] indicates
Acting Commissioner Berryhill was lawfully filling the
Commissioner's office on an acting basis when she ratified [the]
ALJ['s] appointment" (underscoring added) (standard capitalization
applied) (bold font omitted)); Coe v. Kijakazi, No. 5:22CV226, 2023
WL 554119, at *11-13 (D.S.C. Jan. 27, 2023) (unpublished) (holding
that "analysis begins with looking at the plain language of the
statute," and that "[t]he court agrees with the majority of the
courts to have considered this issue — the plain language of the

51

FVRA provides that Berryhill could resume her role as Acting Commissioner of the SSA as of the date Andrew Saul was nominated for Commissioner"); Hernandez v. Kijakazi, No. 22CV1556, 2022 WL 17751355, at *16 (D.N.J. Dec. 19, 2022) (unpublished) (conducting searching analysis of FVRA's text and legislative history to "find[] that Berryhill was validly serving as Acting Commissioner under 5 U.S.C. § 3346(a) of the FVRA when she ratified the appointment of [the p]laintiff's ALJ in 2018"); Taylor v. Kijakazi, No. 1:21CV648, 2022 WL 4668273, at *9 (M.D.N.C. Aug. 2, 2022) (unpublished) (Webster, M.J.) (noting "agree[ment] with the other judges from this Court, Circuit, and others who have considered this issue at considerable length and concluded that this appointment clause argument [under the FVRA] has no merit"), recommendation adopted, 2022 WL 4621418 (M.D.N.C. Sept. 30, 2022) (unpublished) (Osteen, J.); Lance M., 2022 WL 3009122, at *11 ("[T]he plain language and legislative history of the FVRA confirm that Berryhill could resume her service after Saul's nomination was submitted notwithstanding the fact that her original 210-day period expired before the Senate received his nomination."); Williams v. Kijakazi, No. 1:21CV141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) (unpublished) (characterizing holding in Brian T.D. as "an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the views of the Executive Branch and the Legislative Branch - all of which agree

52

that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired"); Early v. Kijakazi, No. 5:21CV96, 2022 WL 2057467, at *4 (W.D.N.C. June 7, 2022) (unpublished) (expressly disagreeing with Brian T.D. and holding: "[T]he plain language of 5 U.S.C. § 3346 allows for Ms. Berryhill to have resumed her role as Acting Commissioner on the date that Andrew Saul was nominated. Consequently, she had the necessary statutory authority to ratify the appointment the ALJs in 2018 and [the p]laintiff's [] argument fails."), appeal filed sub nom., Rush v. Kijakazi, No. 22-1797 (4th Cir. June 21, 2022).[17]

Additionally, the DOJ has, since at least 1999, interpreted Section 3346(a)(2) of the FVRA to constitute a spring-back provision:

> The [FVRA] incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the

---

[17] Cases decided prior to Brian T.D. similarly found Section 3346(a)(2) to contain a "spring back" provision. See, e.g., Thomas S. v. Commissioner of Soc. Sec., No. C21-5213, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022) (unpublished) ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date that [] Saul was nominated for Commissioner in April 2018."); Reuter, 2020 WL 7222109, at *15 ("Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017. . . . Immediately following the GAO[ Notice], [] Berryhill stepped down from her role as Acting Commissioner and continued to lead the agency from her [DCO] position of record. . . . [H]owever, on April 17, 2018, the President nominated [] Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination."); Patterson, 2018 WL 8367459, at *1 ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination.").

53

> submission of a nomination, even if the 210-day period
> expired before that nomination was submitted.  If the
> 210-day limitation period expires before the President
> has submitted a nomination, the restrictions in § 3348 of
> the Act, which bar anyone from serving in an acting
> capacity, become operative.  If thereafter the President
> submits a nomination, an acting officer is again able to
> perform the functions and duties of the office as of the
> date the nomination is submitted.

DOJ, Office of Legal Counsel, "Guidance on Application of Federal Vacancies Reform Act of 1998," 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (emphasis added) (parentheticals omitted).  Like the DOJ, the GAO - the same agency that found a violation in Berryhill's service beyond 300 days after the resignation of Colvin, see GAO Notice, at 1 - also interprets Section 3346(a)(2) of the FVRA to provide spring-back authority to resume acting service upon a nomination to the Senate, see GAO, No. B-328888, "Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science," www.gao.gov/assets/ b-328888.pdf, at 2 (Mar. 3, 2017) (reporting that the FVRA "contains a spring-back provision that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate" and thus that acting official whose initial 210-days had expired "could resume her service as Acting Director . . . when the President submitted [a] nomination to the Senate" (emphasis added)).

54

Lastly, Plaintiff argues that, "[e]ven if Berryhill was properly acting under the FVRA, her attempt to ratify the appointment of SSA ALJs was still invalid" (Docket Entry 11 at 27), because 'SSA ALJs had been selected by lower staff rather than appointed by the head of the agency'" (id. at 27-28 (quoting Carr, ___ U.S. at ___, 141 S. Ct. at 1357)), and the "'lower staff' were 'not acting under section 3345, 3346, or 3347' of the FVRA when appointing ALJs" (id. at 28 (quoting 5 U.S.C. § 3348(d)(1))). Plaintiff thus contends that the lower staff's actions in appointing ALJs "had 'no force or effect' and 'may not be ratified.'" (Id. (quoting 5 U.S.C. § 3348(d)(2))).

The FVRA's enforcement mechanism provides as follows:

(1) An action taken by any person who is not acting under Section 3345, 3346, or 3347 . . . in the performance of any function or duty of a vacant office to which this section and [other sections of the FVRA] apply shall have no force or effect.

(2) An action that has no force or effect under paragraph (1) may not be ratified.

5 U.S.C. § 3348(d) (emphasis added). Section 3348(a)(2), in turn, defines "function or duty" as "any function or duty of the applicable office" that "is established by statute" or "by regulation" and "is required by statute" or "by regulation to be performed by the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2).

Here, no "statute" or "regulation" required that the Commissioner appoint the SSA's ALJs and, thus, when the SSA's lower

55

staff hired the ALJs, they were not performing a "function or duty of the [Commissioner's] office," 5 U.S.C. § 3348(d)(1). See Bauer, 2022 WL 2918917, at *9 ("Here, no statute or regulation required that the Commissioner of Social Security appoint ALJs; rather, the Supreme Court held in June 2018 that the Constitution required that the Commissioner of Social Security appoint ALJs.  When Social Security staff hired the ALJ here, they were not purporting to act as the agency head."); Sidney M., 2022 WL 4482859, at *14 ("SSA staff was not performing a 'function or duty' of the vacant office of the Commissioner when it appointed ALJs prior to *Lucia*[].  As such, I do not find that ratification of the ALJs' appointments was barred under § 3348 based on the initial appointment by lower-level staff.").

In sum, the plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018.  Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and the GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision. As such, the Court should find that Berryhill lawfully ratified the SSA's ALJs' appointments as her own on July 16, 2018, and thus that Plaintiff's second issue on review fails as a matter of law.

56

### III. CONCLUSION

Plaintiff has not established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security or Remanding the Case for a Rehearing (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.


__/s/ L. Patrick Auld__
**L. Patrick Auld**
**United States Magistrate Judge**

February 21, 2023